## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| and THE STATE OF ILLINOIS, | ) | |
| *ex rel.* SAMUEL ENLOE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 20-cv-1169 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| HERITAGE OPERATIONS | ) | |
| GROUP, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Samuel Enloe brought this *qui tam* case about providing medication to residents of nursing homes without a valid prescription. Defendant Heritage Operations Group operates dozens of long-term care facilities in Illinois, and it gets its prescription medication from Defendant Green Tree Pharmacy. Enloe alleges that nurses at Heritage dispense pain medication to residents in the middle of the night without following the regulatory requirements of the Controlled Substances Act.

Enloe, as a relator, brought this case on behalf of the United States and the State of Illinois. He claims that Heritage and Green Tree violated the False Claims Act by dispensing medication to residents without a valid prescription, and then requesting and receiving payment from the government. Defendants, in turn, moved to dismiss.

For the reasons stated below, the motion to dismiss is granted.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Plaintiff Samuel Enloe spent over 20 years working for Omnicare, Inc., a CVS-affiliated pharmacy company that serves nursing home residents. *See* Am. Cplt., at ¶ 8 (Dckt. No. 10-1). Enloe is currently the owner and operator of Critical Care Pharmacy, a pharmacy that focuses on the needs of long-term care residents. *Id.*

Defendant Heritage Operations Group operates around 60 long-term care facilities (*i.e.*, nursing homes) in Illinois, catering to elderly and infirm individuals. *Id.* at ¶¶ 10–11. Defendant Green Tree Pharmacy is an Illinois-based pharmacy, with multiple locations throughout the state. *Id.* at ¶ 13.

Defendants have a close corporate relationship. The same family owns both companies, and Green Tree operates as Heritage's exclusive pharmacy. *Id.* at ¶¶ 15–16. So Green Tree provides prescription-drug services to Heritage's long-term care facilities. And, in return, Heritage relies on Green Tree for all of its pharmaceutical needs.

In general, a pharmacy must receive a written prescription from a physician before dispensing a Schedule II controlled substance (*e.g.*, opioids) to a patient. *Id.* at ¶ 26. In emergencies, a doctor can call in a prescription to a pharmacist, and a pharmacist can dispense a controlled substance to a nurse, so that a resident can receive it right away. But there are a

number of requirements. *Id.* at ¶¶ 26–27. For example, a doctor must present a written, signed prescription to support the emergency Schedule II verbal order within seven days. *Id.* at ¶ 27.

Operating a facility for the elderly and infirm comes with unique challenges. Facilities must provide residents with much-needed pain medication on short notice. *Id.* at ¶ 23. Sometimes they need medication in the middle of the night. *Id.* And sometimes they need Schedule II controlled substances. *Id.*

That need can create complications for care facilities, because doctors and pharmacists play a role in the distribution of medication. Physicians write the prescriptions, and pharmacists fill them. That process poses extra challenges after hours.

So, to meet the needs of the residents, care facilities have different ways to get access to pain medication at all hours. The key point is that each approach involves both doctors and pharmacists.

Some facilities keep on-site emergency kits with medication. *Id.* at ¶ 24. The kits contain commonly dispensed controlled substances, and they are considered an extension of the pharmacy. *Id.* They are kept locked and secured. *Id.* A nurse can obtain Schedule II controlled substances (including opioids) from emergency kits after the delivery of a written prescription to a pharmacy, or after a pharmacist has received a verbal emergency prescription from a doctor. *Id.*

Some facilities also keep medication on-site in machines called an Automated Dispensing System. *Id.* at ¶ 25. The machines store a variety of prescription medications, including controlled substances. After a doctor issues a prescription, the pharmacy authorizes the release of the medication from the machines by entering a code. *Id.* Nurses at the facility then enter

another code, which releases the medicine from the machines. It sounds like a vending machine, of sorts, for controlled substances and other drugs.

Another option is to employ an on-site pharmacist 24 hours a day, 7 days a week. If a pharmacist is always on call, a pharmacist can dispense prescription medication whenever a resident needs it. *Id.* at ¶ 28.

According to the complaint, Defendants "simply ignore all of these rules and safeguards for handling and dispensing narcotic drugs." *Id.* When a patient needs medicine in the middle of the night, "no pharmacist is available for the practitioner to call, as all of Green Tree's pharmacists went home hours ago." *Id.* at ¶ 31. Heritage and Green Tree do not have round-the-clock pharmacists on site for cost reasons. *Id.* at ¶ 28. Pharmacists cost $65 to $75 per hour, so it is expensive to have pharmacists available all day, every day. *Id.*

The lack of pharmacists puts the nurses in a bad position. "The nurse has a patient in pain and no pharmacist is available for the practitioner to call, as all of Green Tree's pharmacists went home hours ago. With no pharmacists available, the nurse can either take the prescription directly or wait until normal business hours – a poor set of choices when one is dealing with someone in serious pain in the middle of the night." *Id.* at ¶ 31.

According to the complaint, Heritage provides drugs to residents at night by obtaining emergency prescriptions. But Heritage skips a step by cutting out the pharmacist. The nurse obtains the prescription directly from the doctor, and then obtains the medication from an unlocked cabinet. *Id.* at ¶¶ 31–32. The nurse then dispenses the medication to the resident before reaching out to the pharmacy after the fact.

"When a Heritage resident needs pain medication in the middle of the night, the on-duty nurse calls a practitioner for an emergency prescription who then authorizes the nurse to go to

the unlocked, unsecured and unlimited supply of narcotics and take what he or she needs to address the patient's needs." *Id.* at ¶ 29.

Then, on "information and belief," the nurse contacts the pharmacy the following day. *Id.* at ¶ 30. The nurse obtains an "invalid prescription" to cover the drugs that were administered the night before "without a legal prescription." *Id.*

The late-night requests for pain medication typically involve Schedule II narcotics. *Id.* at ¶ 32. But pharmacists can dispense a Schedule II drug only in two limited circumstances: (1) a physician provides the pharmacist with a written and signed prescription for the specific drug; or (2) in an emergency, the physician orally authorizes the pharmacist to dispense the drug, and submits a follow-up written prescription within seven days. *Id.* at ¶¶ 22–27, 33; *see also* 21 C.F.R. § 1306.11(a), (d).

According to the complaint, the nurses at Heritage dispense Schedule II controlled substances without obtaining valid prescriptions, "relying on an oral prescription that is not approved by a pharmacist." *See* Am. Cplt., at ¶ 36 (Dckt. No. 10-1). The complaint alleges, on information and belief, that Heritage receives about 50 late-night requests for pain medication every week. *Id.* at ¶ 14.

Enloe basically alleges that Defendants are distributing drugs without valid prescriptions in violation of the Controlled Substances Act. *Id.* at ¶¶ 32, 43; *see also* 21 U.S.C. § 801 *et seq*. Defendants "allow[] nurses to have illegal access to controlled substances for Heritage residents when a resident's need for pain medication comes up after hours, that is, when there is no pharmacy for a practitioner to call in order to legally get the pain medication prescribed and dispensed." *See* Am. Cplt., at ¶ 32 (Dckt. No. 10-1).

As Enloe sees it, Defendants are violating the False Claims Act by violating the Controlled Substances Act. "Green Tree and Heritage are violating the [C]ontrolled [S]ubstance [A]ct . . . . Therefore, Green Tree violates the False Claims Act by billing Medicare Part D and other various government funded programs for invalid prescriptions." *Id.*

According to the complaint, Defendants "billed the United States government and the State of Illinois for those medications based solely on physician's orders which did not comply with the requirements of 21 C.F.R. § 1306.05(a) and without obtaining a valid prescription." *Id.* at ¶ 43. Enloe also alleges that he "has lost business" to Heritage because his company incurs the "extraordinary expenses" of complying with the Controlled Substances Act. *Id.* at ¶ 37.

Enloe filed a complaint as a relator for the United States and the State of Illinois. The complaint alleges one claim under the False Claims Act and the Illinois False Claims Act. *Id.* at ¶¶ 39–43. The United State declined to intervene. *See* Notice of Election to Decline Intervention (Dckt. No. 16).

Defendants, in turn, moved to dismiss. *See* Defs.' Mtn. to Dismiss (Dckt. No. 31).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

The Federal Rules raise the bar for claims about fraud. Under Rule 9(b), a plaintiff who is "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake." *See* Fed. R. Civ. P. 9(b). The FCA "is an anti-fraud statute and claims under

it are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *See United States ex rel. Gross v. AIDS Rsch. All.-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005).

"The plaintiff must describe the 'who, what, when, where, and how' of the fraud – 'the first paragraph of any newspaper story.'" *See United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)). That said, "courts and litigants should not take an overly rigid view of the formulation. *See United States ex rel. Prose v. Molina Healthcare of Illinois, Inc.*, 17 F.4th 732, 739 (7th Cir. 2021).

But Rule 9(b) carves out an exception for allegations about knowledge. Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See* Fed. R. Civ. P. 9(b).

The particularity requirement aims to "discourage a 'sue first, ask questions later' philosophy." *See Heard v. Trax Recs., Inc.*, 2021 WL 3077668, at *3 (N.D. Ill. 2021) (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011)). The goal is to protect a defendant's reputation from harm, minimize "strike suits" and "fishing expeditions," and provide notice of the claim to the adverse party. *See Walgreen Co.*, 417 F. Supp. 3d at 1084 (citing *Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016)); *see also United States ex rel. Mamalakis v. Anesthetix Mgmt. LLC*, 20 F.4th 295, 301 (7th Cir. 2021) ("This more rigorous pleading standard guards against the stigmatic injury that potentially results from allegations of fraud.") (cleaned up).

### Analysis

The False Claims Act authorizes private parties to bring claims on behalf of the federal government against a defendant who defrauds the United States. *See* 31 U.S.C. § 3730(b). The actions are called "*qui tam*" suits, and the party seeking to represent the government's interest is called a "relator." If a relator prevails, he or she is entitled to a sizable share of the recovery. *See Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 912 (7th Cir. 2009) ("To encourage private citizens to come forward with knowledge of fraudulent activity, the FCA entitles prevailing relators to collect a substantial share of the funds they recover.") (citing 31 U.S.C. § 3730(d)(1)–(2)).

The government has the right, but not the obligation, to proceed on a claim brought by a relator. *See* 31 U.S.C. § 3730(c)(2)(B). Alternatively, the government may elect to dismiss the action notwithstanding the party's objection. *Id.* Where, as here, the government chooses not to pursue the claim in its own right, but does not dismiss the action, the relator can proceed against the defendant. *See* 31 U.S.C. § 3730(c)(3).

Enloe is the relator in this case. The United States declined to intervene, so Enloe must carry the burden of alleging a claim that Defendants defrauded the United States.

In addition to the claim under federal law, Enloe also brings a claim under the Illinois False Claims Act. Courts apply the same standards to both statutes. *See United States v. Walgreen Co.*, 417 F. Supp. 3d 1068, 1084 (N.D. Ill. 2019) ("Courts evaluate IFCA claims under the same standards as those applicable to FCA claims."); *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 716 n.2 (7th Cir. 2017) ("The IFCA closely mirrors the FCA, and to date we have not found any difference between the statutes that is material to a jurisdictional or merits analysis.") (cleaned up); *People ex rel. Lindblom v. Sears Brands, LLC*, 2019 IL App

8

(1st) 180588, 436 Ill. Dec. 606, 143 N.E.3d 101, 112 (2019) ("Because the [Illinois False Claims] Act closely mirrors the federal False Claims Act . . . we may look to federal law for guidance in construing the Act."). No party argues that the analysis is any different under the federal or state statutes. So the Court will consider them together.

## I. The False Claims Act

The False Claims Act "makes it unlawful knowingly (1) to present or cause to be presented a false or fraudulent claim for payment to the United States, (2) to make or use a false record or statement material to a false or fraudulent claim, or (3) to use a false record or statement to conceal or decrease an obligation to pay money to the United States." *See Molina*, 17 F.4th at 739 (citing *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011)); *see also* 31 U.S.C. § 3729(a)(1)(A), (B), (G).

Enloe invokes the False Claims Act, but the complaint does not pin down which provision(s) he is relying on. Defendants interpret the complaint to invoke the first two theories of liability described above. That is, as Defendants read the complaint, Enloe is alleging that Defendants knowingly (1) presented or caused to be presented a false or fraudulent claim for payment to the United States; and (2) made or used a false record or statement material to a false or fraudulent claim. *See* Defs.' Mem. in Supp. of their Mtn. to Dismiss, at 5, 7 (Dckt. No. 32); *see also* 31 U.S.C. § 3729(a)(1)(A), (B).

Enloe does not offer a competing interpretation of his complaint. In fact, his response brief does not even cite the False Claims Act. The Court therefore adopts Defendants' plausible reading of the complaint. The Court reads the complaint to bring a claim under section 3729(a)(1)(A) and section 3729(a)(1)(B) of the Act.

Claims under the False Claims Act include four components: "(1) falsity, (2) causation, (3) knowledge, and (4) materiality." *See Molina*, 17 F.4th at 740; *see also United States ex rel. Streck v. Takeda Pharms. Am., Inc.*, 2022 WL 595308, at *11 (N.D. Ill. 2022). To survive a motion to dismiss, a relator must allege that (1) defendant made a false claim or statement to receive money from the government, (2) the violation proximately caused the alleged injury, (3) defendant knew that the claim or statement was false, and (4) defendant's misrepresentation was material to the government's payment decision. *See Lanahan v. County of Cook*, 2022 WL 2826181, at *4 (7th Cir. 2022); *Mamalakis*, 20 F.4th at 300–01; *Molina*, 17 F.4th at 739–40.

Defendants primarily focus on the first element, arguing that Enloe fails to adequately allege the submission of a false claim to the government. The Court agrees.

Again, a claim under the False Claims Act involves fraud, so the complaint must surmount a heightened pleading standard under Rule 9(b). To bring a claim under section 3729(a)(1)(A) or section 3729(a)(1)(B), a relator must allege "specific facts demonstrating what occurred at the individualized transactional level." *See Lanahan*, 2022 WL 2826181, at *4. "This includes the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated" to the government. *Id.* (cleaned up).

The complaint doesn't offer very many details about the alleged fraud. At best, it sketches the general outline of the story, without filling in very many details. Consider the following paragraphs, which are the sum total of the allegations of fraud:

> 14. Green Tree's regular business hours end at 5 p.m. Monday through Friday. It is open for part of Saturday and is closed on Sundays. Based upon the size of Heritage's operation and on information and belief, Heritage receives approximately 50 late night requests for pain medication every week.

10

. . .

28. . . . Heritage and Green Tree are unwilling to employ pharmacists 24 hours a day 7 days a week due to the negative impact on Green Tree's profitability.

29. When a Heritage resident needs pain medication in the middle of the night, the on-duty nurse calls a practitioner for an emergency prescription who then authorizes the nurse to go to the unlocked, unsecured and unlimited supply of narcotics and take what he or she needs to address the patient's needs.

30. On information and belief, the nurse follows up with the pharmacy the following day and then the pharmacy obtains an invalid prescription to attempt to cover the drugs that were administered the night before without a legal prescription.

. . .

32. Relator now comes . . . with evidence that Green Tree and Heritage are violating the [C]ontrolled [S]ubstance [A]ct, by allowing nurses to have illegal access to controlled substances for Heritage residents when a resident's need for pain medication comes up after hours, that is, when there is no pharmacy for a practitioner to call in order to legally get the pain medication prescribed and dispensed. Therefore, Green Tree violates the False Claims Act by billing Medicare Part D and other various government funded programs for invalid prescriptions.

33. These late-night requests for pain medication typically are for Schedule II narcotic medications. . . .

. . .

36. . . . [T]he nurses working for Heritage routinely dispense Schedule II controlled substances without first obtaining a Doctor/practitioner's written prescription, relying on an oral prescription that is not approved by a pharmacist.

43. . . . Heritage nurses routinely administer Schedule II controlled narcotic substances[] to Heritage residents[,] and Green Tree billed the United States government and the State of Illinois for those medications based solely on physician's orders which did not comply with the requirements of 21 C.F.R. § 1306.05(a) and without obtaining a valid prescription.

*See* Am. Cplt., at ¶¶ 14, 28–30, 32–33, 36, 43 (Dckt. No. 10-1).

11

The most basic problem with the complaint is that it alleges little more than a failure to comply with regulatory requirements. Enloe basically alleges that Heritage and Green Tree are not complying with the Controlled Substances Act when they dispense medication to residents in the care facilities. That's about it.

A failure to comply with a regulatory requirement, without more, is not enough to state a claim for a violation of the False Claims Act. "Violating a regulation is not synonymous with filing a false claim." *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1107 (7th Cir. 2014); *see also Berkowitz*, 896 F.3d at 842 (citing *Grenadyor*); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999) ("[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations."); *United States ex rel. Lanahan v. County of Cook*, 2020 WL 6894395, at *9 (N.D. Ill. 2020) ("FCA claims do not simply arise from accounting failures, improper procedure, or disregard for regulations."); *United States ex rel. Sibley v. Univ. of Chicago Med. Ctr.*, 486 F. Supp. 3d 1210, 1218 (N.D. Ill. 2020) ("Regulatory violations are not synonymous with the presentment of a false claim, which requires a defendant to make a false certification of compliance with a regulatory provision."); *United States v. Pfizer Inc.*, 2019 WL 1200753, at *7 (N.D. Ill. 2019) ("Absent an allegation of a single claim, this Court cannot begin to determine whether Defendants' alleged regulatory violations misrepresented or omitted information about the Sapphire sets under the FCA."); *United States ex rel. Stop Illinois Mktg. Fraud, LLC v. Addus Homecare Corp.*, 2018 WL 1411124, at *4 (N.D. Ill. 2018) ("[I]t is not sufficient for a relator to merely describe fraudulent or unlawful activity. A relator must allege that the defendant submitted false *claims*.") (emphasis in original); *United States ex rel. Lisitza v. Par Pharm. Cos.*, 276 F. Supp. 3d 779, 789 (N.D. Ill. 2017) (finding no misrepresentation where the plaintiffs were

"primary concerned with [ ] whether it was permissible to dispense the subject drugs at all, not with whether there was a false representation about the drugs, their cost, or the quantity dispensed").

To bring a claim under the False Claims Act, Enloe would need to allege more than a failure to comply with the regulatory requirements of the Controlled Substances Act. Enloe would need to allege, with particularity, that Defendants submitted false claims to the government for payment. *See United States ex rel. Suarez v. AbbVie Inc.*, 2019 WL 4749967, at *10 (N.D. Ill. 2019). "A plaintiff cannot allege this link by merely describing fraudulent or unlawful activity. Rather, he or she must allege the submission of a fraudulent claim." *Id.*; *see also Berkowitz*, 896 F.3d at 841 (affirming dismissal of FCA claims where "the complaint fail[ed] to allege . . . any specific facts demonstrating what occurred at the individualized transactional level for each defendant"); *Singer v. Progressive Care, SC*, 202 F. Supp. 3d 815, 825 (N.D. Ill. 2016) ("In the FCA context, the particularity requirement means that a relator must plead at least some actual examples of false claims."); *United States v. Nuwave Monitoring, LLC*, 2016 WL 750155, at *5 (N.D. Ill. 2016) ("[T]o adequately allege an FCA violation, a plaintiff must allege the submission of a fraudulent claim.").

Here, Enloe relies on two broad sentences that allege in conclusory fashion that Green Tree submitted false claims to the government. The complaint alleges that Green Tree "violates the False Claims Act by billing Medicare Part D and other various government funded programs for invalid prescriptions," and that Green Tree "billed the United States government and the State of Illinois for those medications." *See* Am. Cplt., at ¶¶ 32, 43 (Dckt. No. 10-1).

The allegations hover at the highest level of generality. There are no concrete allegations about Defendants submitting false claims to the United States. The complaint provides no

details about when Defendants submitted fraudulent claims, or who submitted the false claims on behalf of Defendants, or how many claims they submitted, or how much money Defendants received, and so on. There is nothing about the underlying identities of the patients, nurses, practitioners, or anyone else who worked together to provide the invalid prescriptions and submit false claims.

Courts generally agree that when a relator pleads "lengthy fraudulent schemes, the relator need only allege representative examples of the fraud with particularity." *See United States v. Addus HomeCare Corp.*, 2017 WL 467673, at *10 (N.D. Ill. 2017) (collecting cases); *see also United States ex rel. John v. Hastert*, 82 F. Supp. 3d 750, 760 (N.D. Ill. 2015) ("[A] plaintiff who pleads a fraudulent scheme involving numerous transactions over a period of years need not plead specifics with respect to every instance of fraud, but he must at least provide representative examples.") (quoting *Mason v. Medline Indus., Inc.*, 731 F.Supp.2d 730, 735 (N.D. Ill. 2010)); *Peterson v. Cmty. Gen. Hosp.*, 2003 WL 262515, at *2 (N.D. Ill. 2003) ("To be clear, the court does not expect relator to list every single patient, claim, or document involved, but he must provide at least some representative examples.").

Enloe appears to allege a lengthy scheme. The complaint offers no parameters on when, exactly, Defendants allegedly submitted the false claims. Heritage has operated for decades. So, understood broadly, the alleged fraudulent practice has been going on for multiple years across multiple facilities.

But Enloe does not submit any representative examples of fraudulent claims for reimbursements. He cannot state an FCA claim by relying on broad allegations of the underlying scheme, with no representative examples of fraudulent claims. Two conclusory sentences about the submission of false claims won't cut it.

14

Enloe responds that he is not required to include specific documents or bills to his complaint. True, the Seventh Circuit has explained that "a relator need not produce a copy of the actual document making the false claim." *See Leveski v. ITT Educ. Servs.*, 719 F.3d 818, 838 (7th Cir. 2013); *see also Presser*, 836 F.3d at 777. Relators do not need to attach carbon copies of a defendant's fraudulent claims to the government.

But a relator must do more than "simply alleging generally that claims were submitted." *See Addus HomeCare*, 2017 WL 467673, at *10. The relator cannot "merely describe a private scheme in detail," and then tack on allegations of fraudulent billing "without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *See United States ex rel. Dolan v. Long Grove Manor, Inc.*, 2014 WL 3583980, at *3 (N.D. Ill. 2014) (cleaned up).

Instead, a relator needs to allege facts that "permit the reasonable inference that the defendant presented false claims to the government." *See United States ex rel. Zverev v. USA Vein Clinics of Chicago, LLC*, 244 F. Supp. 3d 737, 745 (N.D. Ill. 2017); *see also United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 870 (7th Cir. 2011) ("A relator need not have seen the claims submitted to the federal government . . . but must know enough to make fraud a likely explanation for any overbilling.").

Enloe has failed to include particularized factual allegations that give rise to a plausible inference of fraud. *See Mamalakis*, 20 F.4th at 301. He relies on blurry descriptions of a fraudulent scheme that extends over multiple years and numerous locations. The complaint does not include the time, place, or content of the misrepresentations, or the method by which the misrepresentation were communicated. *See Lanahan*, 2022 WL 2826181, at *4. There is no particularity, by any metric.

15

At times, courts have allowed FCA claim to survive dismissal, even without examples of false claims. But those cases involved descriptions of the underlying fraud with significantly more meat on the bone. *See, e.g.*, *Addus HomeCare*, 2017 WL 467673, at *11 ("Although Relator has not explicitly alleged that Addus submitted a Medicare claim for these twelve patients, Relator has provided enough information to the court about specific patients who received care and the quantity of claims submitted to Medicare generally to meet the requirements of Rule 9(b)."); *United States v. Omnicare, Inc.*, 2014 WL 1458443, at *10 (N.D. Ill. 2014) (holding that relator pled sufficient details of the false claims because the complaint "alleged that Omnicare submitted false claims daily from its offices in Illinois between January 2009 and December 2011 and explained the practice by which it was done, how and when payment was received, and why the claim was false"); *United States ex rel. Geschrey v. Generations Healthcare, LLC*, 922 F. Supp. 2d 695, 705 (N.D. Ill. 2012) ("Despite Relators' lack of specific knowledge about billings submitted to the government, the fact that most of Generations's patients were receiving government benefits and Generations billed Medicare and Medicaid at a *per diem* rate for each covered patient creates a strong inference that bills for the care of patients as to whom fraud has been alleged were submitted to the government.").

Enloe musters two short arguments to defend the complaint. First, he argues that the complaint alleges a false statement to the United States by omission, also known as the "implied false certification" theory. *See* Pl.'s Resp., at 13 (Dckt. No. 40). Second, he contends that the Court should "flexibly" apply Rule 9(b) to his complaint. *Id.* at 10–13. Neither response moves the needle.

First, Enloe argues that the complaint alleges that Defendants submitted claims to the United States "that were premised on the assumption that the Defendants had complied with all

16

applicable federal and state laws and regulations." *Id.* at 13. When they sought payment, Defendants omitted their noncompliance with the Controlled Substances Act. That omission, as Enloe see it, gives rise to a claim under the "implied false certification" theory.

Recall, the FCA requires a party to knowingly present, or cause to be presented, a false or fraudulent claim for payment to the United States. *See* 31 U.S.C. § 3729(a)(1)(A). The statute also applies to a party who knowingly makes or uses a false record or statement material to a false or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1)(B). On its face, the FCA covers an express false certification – "that is, an affirmative misstatement of compliance with a statute, regulation, or other contractual obligation to obtain payment from the government." *See Molina*, 17 F.4th at 742.

In recent years, the Supreme Court has interpreted the FCA to encompass an "implied false certification" theory of liability. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 186 (2016). An implied false certification theory relies on fraud involving "the omission of key facts rather than affirmative misrepresentations." *See Molina*, 17 F.4th at 740. "This type of liability arises if the 'defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements[;] those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided.'" *Id.* (quoting *Escobar*, 579 U.S. at 187) (alteration in original).

Invoking the implied false certification theory does not get Enloe over the hump when it comes to pleading with particularity. A party can commit fraud expressly, or by omission. Either way, the plaintiff must plead that fraud with particularity.

17

A fraud based on an omission is still fraud, and any fraud requires pleading with particularity. *Id.* at 742 ("Implied false certification is just another genre of fraud, and so plaintiffs must as usual satisfy Rule 9(b)'s requirements to plead falsity, materiality, and causation with particularity."); *Berkowitz*, 896 F.3d at 841 ("Though [the Supreme Court] clarified the circumstances under which a plaintiff may proceed on an implied false certification claim, its analysis does not change the fact that a plaintiff must sufficiently plead the essential elements of an FCA claim."); *Grenadyor*, 772 F.3d at 1106 ("Even if we accept the validity of the implied-certification theory of false claims, Grenadyor has not alleged conduct within the scope of the theory with sufficient specificity to satisfy Rule 9(b)."); *Pfizer*, 2019 WL 1200753, at *6 ("Relator's implied certification theory fails at the outset; Relator cannot establish the 'specific representation' condition, because he fails to allege false claims with sufficient particularity under Rule 9(b).").

Enloe has not pled fraud by omission with particularity. That is, the complaint does not include any details about what false claims Defendants submitted to the United States, or when, or how much, and so on. Enloe offers no details about any claims for payment. He simply alleges a regulatory failure, and a failure to comply with regulations is not enough.

Second, Enloe argues that this Court should relax the requirements of Rule 9(b) because he cannot obtain information about specific false claims submitted to the government. Enloe misses the mark.

Some courts have relaxed the requirements of Rule 9(b) when a relator cannot obtain sufficient information to support his or her allegations of fraud.[1] *See Suarez*, 2019 WL 4749967,

---

[1] One wonders if that approach is consistent with Rule 9(b). It is often the case that a plaintiff may not have specific facts to support a fraud claim. But that's not much of a reason to excuse the lack of information. If anything, Rule 9(b) exists to weed out claims that lack support with specific facts on day one. It performs a gatekeeping function for plaintiffs who, from a factual perspective, don't have the

at *12 (citing *Lusby*, 570 F.3d at 853–54, and *Berkowitz*, 896 F.3d at 841).  In limited circumstances, a relator can rely on "information and belief" to support allegations of fraud.

If the window of opportunity is open at all, it isn't open very far.  A party "may make allegations on information and belief in the fraud context when '(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions.'"  *See Berkowitz*, 896 F.3d at 841 (citation omitted).  And even then, the complaint "must still describe the predicate acts with some specificity to inject 'precision and some measure of substantiation' into his allegations of fraud."  *Id.*; *see also Mamalakis*, 20 F.4th at 301 ("[A]lleging fraud 'on information and belief' is normally insufficient to satisfy Rule 9(b)'s heightened pleading standard.").

Here, Enloe invokes "information and belief" to support his allegation that Green Tree filled out invalid prescriptions.  *See* Am. Cplt., at ¶ 30 (Dckt. No. 10-1); *see also id.* at ¶ 15.  But he hasn't satisfied the first requirement.  Enloe has not shown why basic facts about the fraud are inaccessible to him.

If anything, the complaint does the opposite.  Enloe purports to rely on his "personal knowledge" based on his years in the industry, and based on "interviews and conversations" with former customers.  *Id.* at ¶ 38.  Enloe alleges that he has "personal knowledge that Heritage nurses routinely administer Schedule II controlled narcotic substances[] to Heritage residents[,] and Green Tree billed the United States government and the State of Illinois for those medications based solely on physician's orders which did not comply" with regulatory requirements.  *Id.* at ¶ 43.  In his brief, Enloe adds that he has knowledge of the fraud based on

---

goods.  A lack of information should be a reason to dismiss a fraud claim, not a reason to let it go forward.

his decades of experience and based on conversations with Defendants' former employees. *See* Pl.'s Resp., at 11 (Dckt. No. 40).

If Enloe has personal knowledge of the fraud, then he does not need to rely on allegations based on information and belief. He doesn't need that pleading crutch when he has enough information to stand on his own two feet. *See Suarez*, 2019 WL 4749967, at *12 ("Because Relator here has not alleged that he lacked access to claim information, he is not entitled to a relaxed application of Rule 9(b)."); *United States v. McMahon*, 2016 WL 5404598, at *13 (N.D. Ill. 2016) (holding that relator's allegations were insufficiently particularized because "Relators fail to provide any detail as to the nature of the federal subsidies and because Relators pled on information and belief without arguing that they lack access to further information about the contracts at issue").

Even if Enloe had no such knowledge, the complaint would not qualify for the flexible approach under Rule 9(b), meaning the approach that allows allegations based on information and belief. Again, when the Seventh Circuit applies the "relaxed" Rule 9(b) standard, "the relator must still describe the predicate acts with some specificity to inject 'precision and some measure of substantiation' into his allegations of fraud." *See Berkowitz*, 896 F.3d at 841 (quoting *Presser*, 836 F.3d at 776).

Enloe provides next to no details about the who, when, where, and how of the alleged fraud. The Court needs at least some explanation of the timing, location, and scope of Defendants' invalid prescriptions. Allowing Enloe's complaint to survive under a relaxed application of Rule 9(b) would allow an exception to swallow the Rule.

The complaint fails to allege falsity with particularity, so it fails to state a claim under the False Claims Act. Falsity is one problem. Materiality is another.

20

Even if Enloe had pled falsity with particularity, the complaint fails to allege that the omissions were material to the government's decision to pay. *See United States ex rel. Nelson v. Sanford-Brown Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016). That is, "[r]elator fails to allege that the Government's decision to pay would have been different had it known of the alleged regulatory violations." *See Pfizer*, 2019 WL 1200753, at *8; *see also Molina*, 17 F.4th at 740 ("It is not enough simply to say that the government required compliance with a certain condition for payment. The facts must indicate that the government actually attaches weight to that requirement and relies on compliance with it."); *United States v. Luce*, 873 F.3d 999, 1011 (7th Cir. 2017) (explaining that courts must "undertake a rigorous materiality inquiry").

In sum, the complaint fails to come forward with enough facts to plead with particularity a claim under the False Claims Act.

## II.     The Illinois False Claims Act

As explained above, "[c]laims pursuant to the [Illinois False Claims Act] are analyzed like those under the federal False Claims Act." *See Cunliffe v. Wright*, 51 F. Supp. 3d 721, 740 (N.D. Ill. 2014). The same heightened pleading requirements of Rule 9(b) apply equally to both statutes. *See United States ex rel. Gutman v. Chicago Vein Inst.*, 2021 WL 170674, at *2 (N.D. Ill. 2021); *United States ex rel. Ailabouni v. Advoc. Health & Hosps. Corp.*, 2017 WL 4310640, at *4 (N.D. Ill. 2017) ("Because the FCA and IFCA are anti-fraud statutes, claims under both must also meet Rule 9(b)'s heightened pleading requirements.") (citing *United States ex rel. Gross v. AIDS Rsch. All.–Chicago*, 415 F.3d 601, 604 (7th Cir. 2005)).

The complaint fails to state a claim under the False Claims Act, so it fails to state a claim under the Illinois statute, too. *See, e.g.*, *United States v. Molina Healthcare of Illinois, Inc.*, 2019 WL 3555336, at *1 (N.D. Ill. 2019) (dismissing the complaint because "Relator has failed to

plead his FCA and [IFCA] claims with the required particularity"); *Nuwave Monitoring*, 2016 WL 750155, at *7 ("FCA case law applies with equal force to IFCA claims. Because Plaintiffs fail to allege a representative example of a false claim being submitted to Medicaid, Plaintiffs fail to adequately allege an IFCA claim.") (citation omitted).

### Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted.

Date:   August 18, 2022    _____

Steven C. Seeger
United States District Judge